# In The United States District Court
## For the District of Maryland
### (Northern Division)



---

Anna E. Dale

     Plaintiff,

            CIVIL ACTION NO.

            CCB09-cv-3124

Martek Biosciences Corp., et al.,

---

  Answer to Memorandum of Law and Opposition
to Defendant's Motion to Dismiss and Opposition
for Entry of Summary Judgment.

          _____

          Anna E. Dale
          1644 Woods Lane
          Denver, NC 28037
          (704) 966 0279

**CCB-09-CV-3124**

A plaintiff or plaintiff's in a securities fraud case, in
this case years of frauds, can not package or "repackage" a
case. Plaintiff's can only do their very best to unravel
the fraudulent actions of known perpetrators with the
limited resources available for such action. My, our,
complaint(s) against Martek Biosciences is rooted well
beyond the actions of these defendants since Mead Johnson
and Ross representing 87% of the U.S. formula market were
tied at the hip with Martek's ability to survive and
provide Mead and Ross their only means of over coming what
has been described in the following manner by an obscure
Canadian publication back in 2002.

" **Infant formula is currently a commodity market, with all
products being almost identical and marketers competing
intensely to differentiate their product. Even if Formulaid
(the name of the DHA/ARA fatty acid combination) has no
benefit, we think it would be widely incorporated into
formulas as a marketing tool and to allow companies to
promote their formula as closest to human milk." "With a
15-30% increased cost to the consumer to purchase DHA/ARA
enriched formulas, this comes as no surprise."**

As with the recent **Supreme Court opinion**

**Merck & Co. Vs. Reynolds.**

**"This Court long ago recognized that something different was needed
in the case of fraud, where a defendant's deceptive conduct may prevent
a plaintiff from even *knowing* that he or she has been defrauded.**

1

**Otherwise, "the law which was designed to prevent fraud" could become "the means by which it is made successful and secure."**

The high court provides a laser perfect summary of Martek's **Modus Operandi** over the years deceiving investors every step of the way. Martek management's/board's frauds were aggressively initiated during 2002 while congress legislated **Sarbanes Oxley** dealing with Wall Street frauds, Enrone, Worldcom, TYCO etc., at that time.

The intent at Martek were clearly geared to circumvent any such legislation, **Sarbanes Oxley,** for the sole benefit of their insiders while consistently fraudulently abusing the securities markets for more than the 5 year statue limit Hogan & Hartson continually invoke. In fact Hogan & Hartson have managed Martek from the Martek submission for FDA GRAS February 29, 2000, on the second try after the failure of the first GRAS attempt, the first secondary equity offering, April 2003, the undisclosed FDA failure of September 8, 2004, the orchestrated April 27, 2005 "hoarding" CC resulting in a class action that addressed none of the true ongoing frauds and most recently Hogan & Hartson's Balitmore branch made claims of Bristol Myers, Mead Johnson's former parent company (located on Park Avenue NY blocks from an Hogan and Hartson office) before the $8 billion IPO/spin off, as a client. **The stakes were high and the expertise was at hand for all tied to the Martek "investment story" to gain their share of riskless**

2

profits and benefits at the expense of the public
securities market. The recent Merck v. Renold's Supreme
Court case has strucking similarities to this Martek case.
The one glaring difference is that in the Merck case the
fruad was based on one product while in the Martek case the
entire commercial investment concept of Martek Biosciences'
was fraudulently altered to abuse the securities market for
insider profit and for use of public capital by entities
not at risk for monies invested in Martek, riskless profits
and rewards, ongoing, for insiders. A fraudulent process
that took years to accomplish and years of continued
fraudulent cover up to maintain, for the purpose of
claiming expired fraud statues. Crucial material inventment
information is continually denied investors over a period
of more than 5 years while insiders continue to receive
their financial rewards, in various forms based on those
frauds. Frauds which have individually and cumulatively
accomplished their intent over years of time, when one main
intent is/was to abuse the statue of limitations
legislation, it's difficult to accept the abuse as the
legal logic for dismissing securities fraud(s) claims.

To allow the defendants to hide behind their stautue of
limitations claims in this case would allow them to defraud
the courts based on continuious fraudulent acts. Defendants
have already defrauded the court by framing their known
channel stuffing problem for the U.S. formula market with

3

their orchestrated "hoarding" excuse in April 27, 2005 and have continued with that fraudulent strategy with misinformation regarding mothballing of capacity in October 2007 which was all tied to undisclosed n-hexane pollution problems, claims of patent success, October 2007, when commercial failure was the only true possible result from OmegaTech's 2002 purchase and the much hyped adult DHA markets and continued cover up of failures such as the EFSA failed efficacy attemps for DHA/ARA some time in 2008.

The track record becomes simple factual evidence once uncovered and based on it's consistency over years with the extraordinary results for it's intended beneficuaries the question of scienter becomes clear. Martek has only been a U.S. formula salvage operation from the start for it's primary customers/partners, Mead Johnson and Ross 87% of the U.S. formula market, and not any of the other mega growth claims management and board were responsible for aggressively presenting to investors in their nearly once a month appearance before them.

4

The fraudulent growth profile of the world wide markets and application for Martek DHA that could not possible be attained based on core undisclosed failures and barriers occuring over years, beyond the 5 year statue for frauds, was the only driver of Martek's stock value and the only reason to invest in Martek Biosciences.

- Martek Biosciences Corp



Since the frauds were ongoing for years and the cover ups effective and ongoing it's easy to spot where Martek insiders were most aggressive with their frauds. Stock values would have never spiked going into 2005 for a second time if Martek didn't need to raise more equity capital, January 2005 secondary equity offering, to pay off their bankers on the $85 million line of credit before they started to unwind the frauds with other fraudulent and misinformations campaigns.

5

**Failed to disclose material failures and crucial barriers**
which countered Martek's fraudulent growth profile
investment story of the OmegaTech purchase and the alleged
world wide demand for their formula DHA/ARA.

**1999** Already have a EPA toxic air pollution problem, not
information Martek wants exposed especially tied to a
formula ingredient and other alleged health benefits for
their DHA.

**March/April 2002**, Martek buys OmegaTech on the fraudulent
pretense of major expansion, consistently presented to
investors as adult DHA markets and applications greater
than the $400 million and later $550 million infant formula
markets for Martek's DHA/ARA's in formula, but it's only
true and effective purpose was as an obstructionist
strategy to keep Nutrinova/Protose division of Celanese, a
multinational corporation, out of the DHA markets,
including formula. That fraud was perpetrated aggressively
on Martek investors from the March/April 2002 purchase of
OmegaTech through the alleged legal patent battles in the
U.S. Delaware District courts through the September 3, 2009
U.S. Appeals court ruling, 7 ½ years. The legal battle was
the purpose of the OmegaTech purchase,there was little else
of value commercially from the Martek/OmegaTech union other
than a fraudulent adult DHA growth story of multiple
markets and applications which was presented for years as

6

being a larger DHA market to Martek than it's alleged $550 million opportunity in the world wide $8.5-$9.5 billion formula market. In addition management was telling investors that the OmegaTech DHA-S, *Schizochytrium* sp., would ultimately replace the more expensive and harder to work with formula DHA, *Crypthecodinium cohnii,* for a cheaper more profitable DHA/ARA product for formula. The DHA-S has a much higher n-hexane content and a much higher cholesterol count making it a undisclosed bad candidate for formula but once again supplying Martek with a great "investment growth" story while ignoring the facts.

September 5, 2002, Major failure with the National Academy of Sciences who only allowed Martek DHA labeling ability based on the short chain omega-3 fatty acid alpha-linolenic acid ("LNA"). DHA can contribute up to 10 percent of the total n-3 fatty acid intake and therefore up to this percent can contribute towards the [Adequate Intake] for [LNA]. LNA was substantially cheaper than DHA, and Martek lacked a competitive edge in making LNA. The OmegaTech/Martek milestone agreement specifically addressed the failure of being tied to the cheaper alpha-linolenic acid and the only reason for UNITED STATES COURT OF APPEALS unpublished opionion discovered in August 2008.

FOR THE FOURTH CIRCUIT unpublished opinion, decided July 17, 2007 discovered August 2008, No. 06-1587 was  a

7

provision "does not require that the National Academy of Sciences' recommendation on DHA come <u>unattached</u> to a recommendation on LNA. Rather, it requires that the nutrient content claim for DHA <u>not include</u> LNA." While the poorly written milestone agreement became a matter of law resulting in Martek paying former OmegaTech investors based on the commercial failure of "come unattached" vs. "not include" is exactly the same commercial implication.  The failure is important to investors especially since Martek management was presenting their newly acquired  OmegaTech DHA-S as the next wave of multiple products and markets with an established solid base by OmegaTech, in the DHA business since 1987 with 100 patents and commercially established. Without the milestone legal battle and the <u>unpublished opinion, discovered in August 2008, and the September 9, 2008 Lonza Appellant's Brief</u> the long standing and ongoing frauds would have never been discovered.

<u>April 8, 2003</u> First news and 8-K filed regarding a fire marshal report of a n-hexane explosion. There is vague mention of the n-hexane used in Martek's "production" process. Explosion occurred on March 12, 2003, about a month prior to any misinformation provided in the alleged disclosures and news.

**8-K filed June 3, 2003** *Public equity offering* – On April 22, 2003 the Company closed on a public offering of its common stock, raising net proceeds of approximately $84 million. <u>These funds will be used primarily to fund the expansion of production to meet the growing demand for Martek's nutritional oils.</u> The April 22, 2003 secondary equity offering also had 315,000 shares or options, unknown based on various misinformation offered, sold by Richard Radmer listed as <u>"selling shareholder"</u> and then as a "retired" president, without any disclosure to his retirement any time prior to his selling. Radmer never filed a form 4 on the 315,000 stock/option selling and had always been on the board and later disclosed as a "part time employee" in SEC filings during his aggressive continued insider selling through September of 2005 over a 2 year 5 month period.

Mr. Flanagan, Clark Enterprises, given contract for the massive capacity build out, he is currently Chairman of Martek's board of directors. Mr. Flanagan is Executive Vice President of Clark Enterprises, Inc. ("Clark"), one of the largest privately-held construction companies in the country. Mr. Flanagan has been a Director of Martek since April 2002 and in June of 2007 was elected Chairman of Martek's Board of Directors.

9

<u>September 22, 2003</u> Steve Dubin becomes President of Martek Biosciences. Mr. Dubin has worked for Martek for years in several different high level capacities prior to his appointment to President of Martek Biosciences.

<u>September 23, 2003</u> did not disclose the filing of the alleged patent infringement case against Nutrinova. <u>A so called infringement battle that was only an obstructionist strategy based on Martek's OmegaTech purchase in March/April 2002</u> <u>that was being fraudulently presented to investors as a major synergistic merger of two established areas of DHA application, infant and adult</u>. Instead of revealing the true Martek commercial profile, the limited salvage operation of the U.S. formula market, Mead Johnson and Ross controlling 87% U.S. market share, with it's limited/capped growth opportunity and the reality of a limited/capped stock price, high teens low 20's, based on insider known problem of no EPS growth opportunity, fooled all the analysts through 2005 and even some into 2007 waiting on major DHA adult markets/application that were doomed before Martek bought OmegaTech in 2002. Based on the Martek reality from 2002 and on there would be serious difficulty, really a impossibility, for insiders to be able to cash in their massive stock options as well as the ability for Martek to raise the $164 million in secondary offering equity capital to over come the undisclosed

10

n-hexane pollution restrictions, limiting the use of then existing plant and equipment and killing any major plant expansion at the Winchester Kentucky plant,  problems. Undisclosed pollution problems existed since 1999 but became more of a major undisclosed barrier with the n-hexane explosion/fire of March 12, 2003 at the Winchester plant. The resulting massive over buying/building of plant and equipment over the 2 1/2 plus years of fraudulently orchestrated information of inability to meet DHA/ARA demand for formula was doomed even before it began. Formula demand which was just a channel stuffing campaign in the U.S. formula wholesale and retail markets that presented the artificial mega growth for Martek management to exploit the U.S. securities markets for their various needs from 2002 through early 2005 and beyond changed the commercial expectations of what Martek had to offer investors permanently, offering multi markets and applications off of one product source it's DHA.

December 16, 2003 A completely fraudulent 4th quarter conference call fraudulently misrepresenting every aspect of Martek's businesses. Filed as a 8-K, as transcripts of the conference call as some sort of back door attempt to cover the September 23, 2003 alleged patent infringement filing. Before, during and after this call was the largest insider trading series, that we know of.

11

The most heavy illegal insider selling took place between September 11, 2003 and January 16, 2004. Insiders took full advantage of a series of undisclosed material failures and barriers that were core issues of Martek's commercial profile, changing Martek's commercial profile for ever.

January 16, 2004  Second undisclosed patent infringement filing against Nutinova in Germany. Same obstructionist strategy with the undisclosed German filing. Some time in October 2003 Nutrinova filed a counter claim against Martek, also went undisclosed.

September 8, 2004 The FDA responds,sent to Hogan & Hartson, to Martek's undisclosed November 2, 2003 back door petition to undermined Martek's fish oil omega-3 competition with a mercury disqualification request. "In addition, the Martek petition stated that sources of omega-3 fatty acids derived from fish (such as fish oils) should be ineligible for the health claim unless the oil has been tested and found to contain less than 0.025 ppm of mercury."
"Martek petition's reason for setting 0.025 ppm was based upon detection limit rather than effect on health, FDA is not persuaded to adopt the Martek petition's request. FDA disagrees with the petitioners' contention that the omega-3 fatty acid qualified health claim should be accompanied by a product label statement about mercury content of fish and

12

possible harmful health effects to the vulnerable
population of pregnant women, women who might become
pregnant, nursing mothers, and young children. Supportive
but not conclusive research shows that consumption of EPA
and DHA omega-3 fatty acids may reduce the risk of coronary
heart disease.  One serving of [Name of the food] provides
[  ] gram of EPA and DHA omega-3 fatty acids.  [See
nutrition information for total fat, saturated fat, and
cholesterol content.]"

Martek uses n-hexane, a toxic solvent to extract it's DHA
and ARA oils which generates toxic air pollution resulting
in major undisclosed problems for Martek in several areas
of their business. In spite of the n-hexane processing
Martek has focused investors on the alleged purity of their
DHA and ARA oils.

<u>Martek's DHA and ARA contaminants, Lead, Arsenic, Mercury
and Hexane are at the same levels as their FDA petition
backdoor claims against their cheaper fish oil competition.
September 9, 2004</u> Martek puts out a totally misleading news
release on the FDA omega-3 qualified health claim making it
seem as though it was commercially positive for Martek's
DHA. Based on the commercial implications of the FDA's
qualified health claim for Omega-3's, for EPA and DHA
combined not DHA alone, potential cardiovascular benefit
and the hidden agenda of Martek's FDA petition the
September 9, 2004 news release was at the very least
deceptive and potentially fraudulent.

13

**MARTEK'S DHA-S (Acquired from OmegaTech)**
Specification for docosahexaenoic acid (DHA) – rich oil
derived from marine microalgae (*Schizochytrium* sp.)

Lead (ppm) max. 0.2

Arsenic (ppm) max. 0.2

Mercury (ppm) max. 0.2

Hexane (ppm) max.   20.0


**MARTEK'S Formula DHA**
Specification for docosahexaenoic acid (DHA) – rich oil
derived from the algae *Crypthecodinium cohnii*

Lead (ppm) max. 0.2

*Arsenic (ppm) max. 0.5*

Mercury (ppm) max. 0.2

*Hexane (ppm) max. 0.3*


*MARTEK's Formula ARA*
Specification for arachidonic acid (ARA) – rich oil derived
from the fungus *Mortierella alpina*

Lead (ppm) max. 0.2

*Arsenic (ppm) max. 0.5*

Mercury (ppm) max. 0.2

*Hexane (ppm) max. 0.3*

- Martek Biosciences Corp



*The only value in the stock is the aggressive fraud.*



**Red-Insider selling   Black-Two Secondary Equity Offerings**
At least $74 million in profit, $51-$60 million in costless
options profits. About $164 million in secondary equity
capital raised off those same frauds whose commercial
expectations were impossible from 2002 and on.

<u>June 24, 2004</u> Linsert gifts 40,060 shares.

<u>September 15, 2004 though April 6, 2005</u> The second round of
illegal selling takes place after the undisclosed FDA
response letter failure of September 8, 2004 but before the
April 27, 2005 orchestrated cover up "hoarding" CC.

<u>November 2004</u> Permit with the Kentucky Division of Air
Quality already exposes, <u>the permit is marked confidential
treatment</u>, that the Winchester plant will not be producing

15

any major volume of production. They could have mothballed
the plant right then based on n-hexane toxic air pollution
limited under 10 tons per year agreement at Winchester.

**January 26, 2005** Martek Biosciences Corporation (Nasdaq:
MATK), today announced that it has closed on its sale of
1,756,614 shares of common stock at a public offering price
of $49.10 per share, raised $81.4 million.

**February 4, 2005 8-K**, MARTEK SIGNS DHA LICENSE AND SUPPLY
AGREEMENT WITH FORTUNE 500 FOOD COMPANY
While subject to final product selection, food formulation,
and consumer testing, the food company intends for the
initial product launch to take place in mid-2006. The
Fortune 500 food company is an innovator in the food
industry and the launch of a DHA fortified product line
will help grow consumer awareness of Martek DHA $^{TM}$. Due to
competitive concerns, the food company prefers not to
disclose its name unless there is a commercial introduction
of the new line of products containing Martek DHA $^{TM}$.
**Kellogg was the company but based on the real undisclosed
patent and toxic solvent problem, especially with the much
higher e-hexane content of the "adult" DHA-S, there was no
way Kellogg was going to make any major commitment to
Martek's DHA for their products.**

16

**February 8, 2006** **Another 8-K filed on Kellogg.**

As previously disclosed, in February 2005, we entered into a DHA license and supply agreement with a major consumer packaged goods company. There are no minimum purchase requirements or financial commitments to us under the agreement and we have not recognized any material revenues under it to date. Since entering into the agreement, Martek has been working closely with the food company on product development efforts. Based on recent discussions with the food company and progress to date on these development efforts, Martek currently believes that, while subject to final product selection, food formulation and consumer testing, the food company now projects that the initial product launch of a food containing Martek DHA will take place in 2007.

**October 1, 2008** Martek's life'sDHA(TM) Featured in New Live **Bright(TM) Brain Health Bar from Kellogg**

COLUMBIA, Md., Oct. 1 /PRNewswire-FirstCall/ -- DHA omega-3 innovator and maker of the life'sDHA™ brand, Martek Biosciences Corporation (Nasdaq: MATK), announced today that life'sDHA is featured in the new Live Bright™ Brain Health Bar, the latest offering from Kellogg, the world's leading producer of cereal and a leading producer of convenience foods. Each bar contains 100 mg of life'sDHA and will be available in two flavors, double chocolate and dark chocolate vanilla. The Live Bright bar is available at major retailers in select markets and online at www.livebright.com.

17

The alleged Kellogg Martek DHA food bar product is nowhere
to be found, stores or on Kellogg's internet site.


**April 27, 2005** Orchestrated a fraudulent "hoarding"
conference call to cover up the artificial growth of the
channel stuffing of the U.S. formula market.  Very narrow
based class action complaints which had none of the series
of material frauds exposed and did not even mention the
rounds of insider selling that took place around and during
the class action period. That legal action runs from April
2005 through April 2008 when it's settled for $6 million
with the plaintiff's attorneys getting about $4.5 million
and Martek investors getting $00.19/share. Nineteen cents
on a $27.49/share drop the day after the conference call.
The $32.49/share close on the next day's trading was still
an inflated valuation based on the still unknown actual
commercial prospects of Martek Biosciences, which only
insiders knew. Before the management proclaimed the
"temporary" setback of the orchestrated cover up
"hoarding", management was giving guidance of $290 to $310
million for 2005 but ended up doing $217 million for 2005.
Missed by $73 to $93 million based on 4 customers/partners.


**June/July 2005** finished the fraudulently hyped, since early
2003, capacity build out. Will mothball most of capacity
when fraudulently convenient in October 2006, can't do in
2005 after the "hoarding" cover up, have to space their

18

cover ups apart. There was some questionable accounting of
assets,plant and equipment, where Martek did not depreciate
their vast unused plant and equipment and as a result
reported higher EPS numbers. So 2006 and 2007 EPS would
have been even more dismal than they already were if Martek
followed generally accepted accounting practices. Even
though it would have not changed Martek's cash flow,
it's yet another example of manipulating numbers which
later had to be corrected and refiled sometime in 2007 with
lower EPS numbers.

<u>September 12-14, 2005</u> Last round of illegal insider, <u>that
we know of,</u> selling. The stock value heads drastically
south in the months after these insider sales.

<u>October 2006</u> Martek proclaims success in the first round of
the alleged patent battle with Nutranova/Lonza which was a
insider known inevitability, due diligence required by
management and board before OmegaTech purchase, before
Martek bought OmegaTech 2002. <u>The inevitable legal battle
was the purpose of the OmegaTech purchase.</u> Three of the
four patents involved in the legal process do not relate to
the fraudulently hyped expectations Martek was presenting
to investors on the alleged vast adult DHA food, beverage,
supplements, prenatal, pharmaceutical markets and
applications while rapidly losing value on what was left on
those patent terms. By the time the September 3, 2009

19

appeals court opinion is issued 2 of the 4 patents are
expired 1 is revived, court's split decision on use beyond
animal feed, for human consumption, leaving 1 to expire in
August of 2011 and 1 to expire in December of 2014.

<u>October 2006</u> Restructuring announcement, unwinding the long
standing frauds, from early 2003, of the "can't meet demand
story", based on business from their 3-4 customers 3 of
which are more partners than customers. "Can't meet demand
story", management has been presenting to investors for
years which they used to massively over build capacity,
using their 2 secondary equity offerings for the capital,
to overcome their undisclosed toxic air pollution problems.
In their October 2006 "restructure" cover up news they
print the <u>"$750 million or better run rate"</u> that management
has been waving in front of investors for years
fraudulently based on the mid 2005 capacity build out as
the basis to expand into the multiple world wide adult DHA
markets and applications as well as to more effectively
address the continually inflated size of the world wide
formula market according to Martek's SEC disclosures. 2001
10-K had the world wide formula market at $6-$8 billion
with a $2 billion U.S. wholesale market, in 2002 10-K it
became $7.5-$8 billion with a $3.5 billion U.S. wholesale
market by 2003 10-K the worldwide formula market is
reported as $8.5-$9.5 billion with the U.S. portion $3.5
billion. During this time Martek is presenting investors a

major jump in potential formula business from $400 million
to as much as $550 million and telling us that the
OmegaTech purchase is Martek's largest market revenue
opportunity from food, beverage, supplements, prenatal,
pharmaceutical and animal feed while massively expanding on
capacity "$750 million or better run rate". Management's
constant drumbeat of the capacity build out as the solution
to their mega growth investment fantasy, the $750 million
or better run rate, also included much easier additional
expansion hype for investors based on the new capacity
footprint. Martek's plant and equipment will never see full
utilization based on the same insider known realities that
existed in 2002, going undisclosed, and every year since.

**June 28, 2007** Martek Announces **Sale of Fluorescent
Detection Products Business; Henry Linsert, Jr.** to Retire
as Chairman, Director Robert J. Flanagan To Become
Chairman. Martek Biosciences Corporation (Nasdaq: MATK)
announced today that its Board has approved the sale of the
Company's Fluorescent Detection Products business for
$900,000 in cash and a minority interest warrant position.
**The Fluorescent Detection Business was one of the other
Martek growth opportunities that was hyped to investors.**

**July 17, 2007 UNPUBLISHED** UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT **No. 06-1587 opinion lays out some of
the frauds by disclosing the insider known but undisclosed**

21

problems, barriers and failures. The opinion shines a very
harsh light on the fact that insiders have not only been
trading on a series of undisclosed material failures but
have also aggressively been fraudulently misrepresenting
the very core of Martek's commercial profile. <u>This document
was discovered August 26, 2008 based on a post by dpfred,
Silver Springs MD, according to the message board website,
posted at 1:50 PM.</u>

<u>October 16, 2007</u> 8-K filed to sweep this core issue, all
disclosed in opinion 06-1587, and it's years of fraudulent
misrepresentation to investors under the carpet. In
connection with the settlement, Martek will issue 341,061
shares of Martek common stock to the former stockholders of
OmegaTech, which represents approximately one-half the
amount of shares that would have been issued for the
achievement of the regulatory milestone under the Merger
Agreement.

<u>September 9, 2008</u> - 2008-1459,-1476 Nutrinova/Lonza's
appellant's brief which exposes the truth about the Martek
purchase of OmegaTech and it's true very limited commercial
value. Exposes the problems with the patents and the actual
risk involved as well as the factual opposite of the
potential reward for all the alleged food, beverage,
prenatal, supplements, pharmaceutical markets and

22

applications being fraudulently hyped by Martek to
investors. The animal feed market was the only true and
clear opportunity based on the OmegaTech purchase and also
the ability to tie up Nutrinova in a patent battle mostly
based on the fermentation processing of Schizochytrium
algae. The September 9, 2008 appellant's brief was
discovered about May 2009.


## Another undisclosed material failure sometime time in 2008

**EFSA rejects Merck omega-3 health claim**

By Shane Starling, **16-Apr-2009**

DHA does not benefit visual or cognitive development in
infants and unborn babies, according to two article 14
opinions published by the European Food Safety Authority
(EFSA) today

**Global algae-sourced DHA leader, Martek Biosciences, had a
similar DHA/ARA (arachidonic acid) dossier turned down last
year,** although the **French arm** of Mead Johnson Nutritionals
had two omega-3, eye **health claims** approved by the NDA in
March, while simultaneously having three infant brain
health claims rejected.

**Martek's close relationship to Mead & Ross is key. Bristol-Myers is parent company of Mead Johnson.**

**Bristol-Myers to Pay $300 Mln** to End Fraud Probe

**June 15,2005** (Bloomberg) -- Bristol-Myers Squibb Co. will pay $300 million to avoid prosecution for inflated sales, and two former company executives were indicted.

**The $300 million payment brings to $839 million** the amount Bristol-Myers will spend to resolve criminal and regulatory probes and investor litigation related to its sales. They were charged with conspiracy and securities fraud for allegedly planning and executing a "**channel stuffing**" scheme to meet internal and external sales and earnings targets, according to the U.S. attorney. The company accepted a ``deferred prosecution''arrangement that also requires changes in its business practices, such as adopting internal controls to thwart future sales abuses.

**Continued practices of not disclosing material failures. The undisclosed 2008 EFSA failure with Martek's DHA/ARA is a multi fraud problem. It represents a stand alone fraud by not disclosing a material failure. The EFSA failure also shines a light on the process of how Martek's DHA/ARA became the standard of formula in the U.S. with no efficacy agency endorsement, tied only to Martek's relationship with Mead Johnson and Ross controlling 87% of U.S. formula market, Martek's only true market a U.S. formula salvage opportunity with Mead Johnson and Ross.**

24

**Bristol-Myers Squibb Agrees To Settle Federal Investigation Of Pricing, Sales, Marketing Practices For $499M**

### 03 Jan 2007

<u>Bristol-Myers Squibb</u> on Thursday announced **a proposed $499 million settlement for a federal investigation** into the company's **pricing and marketing practices**, the <u>Newark *Star-Ledger*</u> reports (Jordan, Newark *Star-Ledger*, 12/22). The settlement -- which has been tentatively accepted by BMS, the <u>Department of Justice</u> and the U.S. Attorney for the District of Massachusetts -- would cover investigations into BMS' marketing of schizophrenia and bipolar disorder treatment Ability for off-label uses (Schmit, *USA Today*, 12/21). **BMS, BMY, spokesperson Jeff MacDonald said the proposed settlement also covers an investigation into alleged over billing of <u>Medicare and Medicaid</u> through inflating average wholesale prices, which are used by the government to set drug reimbursements.**

**Mead Johnson's Enfamil Advertising Referred to FTC Over Dubious Baby IQ Claims**

By Jim Edwards | **Feb 25, 2009**

The **<u>National Advertising Division</u>** has asked the **FTC** to look into **Mead Johnson Nutritionals**' advertising of **Enfamil** infant formula.

The NAD — which functions as the advertising industry's internal police force — **has thrice asked Mead Johnson to stop making unsupported claims for Enfamil.** Those claims include the notion that Enfamil improves eye development and IQ in babies.

## Mission accomplished
**BMY unloads MJN, Nearly an $8 Billion deal when completed.**

**BMY, IPO sale of about 10% of Mead Johnson's ownership**
**NEW YORK, Feb 6 2009(Reuters) - Bristol Myers Squibb (BMY.N) is spinning off its children's and infant nutrition unit in a planned initial public offering next week that would fill its coffers with cash at a time of increasing industry consolidation.**

The unit, Mead Johnson Nutrition (MJN.N), known for such brands as Enfamil, is aiming for a **$562.5 million** IPO that would make it the largest in the United States since last April.

After the IPO, Bristol will still have plenty of room to raise more money off of Mead Johnson, through secondary offerings, particularly if the markets recover and follow-on share issues fetch high prices.

**Bristol would still own about 87.5 percent of Mead Johnson, and retain 98 percent of voting power, according to a regulatory filing.**

26

**Bristol-Myers (BMY) To Spin-Off Mead Johnson (MJN) Holdings**

**November 16, 2009**
**Bristol-Myers Squibb Company**

Bristol-Myers Squibb owns 170,000,000 shares of Mead Johnson class A and class B common stock, representing approximately 97.5% of the **voting interest** and 83.1% of the economic interest in Mead Johnson.

**The list of ongoing frauds is long and factual, over years. The intent to defraud is the only consistent pattern of disclosure at Martek Bioscinces from 2002 to the present. The other consistent pattern is the exceptional profits, salaries, bonuses, fees and sweet heart deals garnered by Martek insiders. The fiduciary requirements of Martek executives and board members has been aggressively replaced by self interest, the very behavior all SEC and anti-fraud legislation was written to prevent in  publicly traded companies. Since the EPS results have failed miserable over time and that hyped mega growth, without channel stuffing to convert the U.S. formula market quickly, never happened the stock has languished around the $20/share value so insiders have managed to substantially raise their compensation in salary, bonus and fees. In addition the insiders now grant themselves stock grants with no cost basis as with previous options, not that they invested for their previous options mega profits either.**

Martek Biosciences was aggressively selling their growth story to investors, the reality of their true commercial ability was consistently concealed from investors. Unlike most investments Martek had a very strong insider element with both Mead Johnson's, since 1992, and Ross's, William Smart former President of Ross from 1977-1987 prior to becoming a Martek Board member from 1992 through 2003. Martek had to overcome it's one market one product reality in order to abuse the securiites markets for insider costless profit and equity capital. The defendants were responsible for creating an fraudulent investment growth story which they perpetrated on investors for years.

Plaintiff, Anna E. Dale, is looking to recoup $73,081.00 in investment losses plus 18% interest through March 31, 2010,  $111,732.00, on losses for a total of $184,813.00 losses plus interest beyond March 31, 2010, plus additional punitive damages based on those monies lost to Martek frauds from 2004 through 2006. This plaintiff would have never invested in Martek without the ongoing aggressively presented fraudulent Martek growth story perpetrated on investors by the defendants.

May 20, 2010

Anna E. Dale

1644 Woods Lane
Denver, NC 28037
(704)966-0279